LATHROP, Respondent, vs. CITY OF RACINE, imp., Appellant.

*September 30—November 17, 1903.*

Waters: Artificial channel or harbor: Riparian rights: Municipal corporations: Building of docks: Special assessments: Constitutional law: Equity: Estoppel.

1. Where an artificial navigable channel has been made by the straightening of a portion of a river constituting a harbor, the abutting owners and the public have the same rights in respect thereto as if such channel were a natural watercourse.
2. Provisions of a city charter authorizing the common council to order riparian owners to build docks along a navigable river or harbor and, if they fail to do so within the time specified, to award contracts for the work and charge the cost as a special assessment upon the property upon or in front of which the docks are built, regardless of the question of special benefits accruing thereto, are invalid as authorizing the taking of private property for public use without compensation.
3. Such charter provisions are not justified as an exercise of police power.
4. The building of such docks by the city and assessment of the cost upon the abutting property pursuant to such charter provisions being wholly without authority of law, a riparian owner who had refused, when ordered, to build the dock upon his land and had never consented to pay the cost thereof, may have the enforcement of such assessment upon his land restrained. The mere facts that he had conveyed a small portion of his land to the United States for harbor purposes, that he knew the work was in progress, and that the suit was not commenced until after the work was completed, do not estop him to question the validity of the assessment.

APPEAL from a judgment of the circuit court for Racine county: E. B. BELDEN, Circuit Judge. *Affirmed.*

This is an action to set aside and have adjudged void the special assessment proceedings and the special assessment certificate issued thereon as a lien upon the plaintiff's premises, described, and to restrain the county treasurer from selling or offering to sell such premises, or any part thereof, to satisfy such assessment. Issue being joined and trial had, the court found, as matters of fact, in effect: (1) The city is a

municipal corporation.   (2) The plaintiff owned the part of block 57 described.   (3) November 19, 1897, certain citizens asked the common council to cause the harbor of Root river to be widened and deepened.   January 17, 1898, the committee made a favorable report, recommending assessment of damages and benefits, (4) and the same was adopted, and the city engineer was directed to make a survey and plat, which he did.   (5) February 28, 1898, the common council adopted such survey and plat, and resolved to apply to the county judge for a jury to condemn and appraise the premises to be taken, April 19, 1898, and directed the city clerk to give the notice required by sec. 896, Stats. 1898. (6) Such proceedings were had that parts of blocks 57, 66, and 67, described, were condemned. (7) June 20, 1898, such proceedings were presented to the common council and referred to a committee; and September 6, 1898, the committee reported favorably, and recommended that steps be taken to provide for the payment of the lands so condemned.   (8) September 6, 1898, an ordinance widening the harbor was introduced and referred to a committee, and September 19, 1898, the same was adopted.   (14) November 14, 1898, an ordinance was introduced to vacate a portion of Dodge street.   (15) December 5, 1898, that ordinance, which had previously been adopted, was reconsidered by the common council.   (16) December 5, 1898, the common council resolved to hear persons interested in the vacation of Dodge street, December 19, 1898.   (7) December 6, 1898, notice thereof was published in the papers.   (18) December 19, 1898, proof of such publication was filed; and January 3, 1899, the common council adopted the ordinance mentioned in finding 14, wherein, for the first time, Dodge street was vacated.   (19) No notice thereof, however, was ever given to the plaintiff.   (20) No notice of *lis pendens,* or other notice, was ever filed in the register's office.   (9) January 3, 1899, the common council, by resolution, directed the clerk to

notify the United States officials of their action, including a copy of such ordinance. (10) January 3, 1899, the common council resolved that the city give deeds of such lands to the United States. (11) The plaintiff gave a deed to the United States of the lands described. (13) March 20, 1899, an ordinance was adopted establishing a dock line on the north side of Racine harbor. (21) March 20, 1899, the common council resolved that the board of public works should prepare plans, specifications, and estimates of cost of docking the north line of Racine harbor, as established by the ordinance then pending before the common council. (12) March 27, 1899, the common council resolved that the city should execute deeds to the United States, and deliver the same. (22) June 5, 1899, the board of public works reported such plans, specifications, and estimates; and June 19, 1899, the harbor committee reported in favor of the adoption of the same by the common council. (23) August 7, 1899, a resolution was introduced in the common council, and was referred to the harbor committee, directing the board of public works to cause the dock to be built, as provided in the ordinance adopted July 18, 1899, and that the board of public works take charge of the work as prescribed by the city charter, and the same was adopted August 21, 1899. (24) August 7 and 8, 1899, an ordinance was adopted for the building of a dock on the north side of the Root river for the distance of 871 feet east of the east line of North Michigan street. (25) August 9, 1899, notice of such ordinance was served on the plaintiff. (26) The plaintiff refused to build such dock, and on January 20, 1900, the board of public works received four bids for the building of the same, all of which were rejected as informal. March 3, 1900, the board of public works received two bids for the work of building such dock—one from the defendant Jones for $14.48 per lineal foot for the portion to be paid for in cash, and the same price for the portion to be paid for by special assess-

ments, and the other from James Cape & Son for $200 per lineal foot for the portion to be paid for in cash, and $2 per lineal foot for the portion to be paid for by special assessments. March 6, 1900, the whole of the work was awarded to Jones, for the prices named in his bid, and thereupon a written contract was made with Jones to that effect; the work to be completed within sixty days from the commencement thereof. (27) In the fall of 1900 the board of public works issued to Jones a special assessment certificate, as follows:

*"Special assessment for building dock on north side Racine Harbor, 1900.*

"Block number 57, original plat No. 1.

"That part of block 57, original plat, bounded on the south side by Root river, on the east by Lake Michigan, on the north by a line 450 feet south of the south line of Hamilton street, on the west by North Michigan street, owned by *W. H. Lathrop,* twelve thousand six hundred fourteen and 98-100 dollars. BOARD OF PUBLIC WORKS,

"P. H. CONNOLLY,
"PAUL OSTERGARD,
"LEO F. MILLER."

Indorsed:

"Special assessment for building dock north side of Racine harbor, 1900.

"Total special assessment, $12,614.98.

"JOHN O. JONES, Contractor."

(28) "That said assessment was for the total cost of building all of the said dock lying east of North Michigan street." (29) That said sum of $12,614.98 was placed on the tax roll of the city for 1900 as a tax against all the property of the plaintiff lying north of Dodge street and east of North Michigan street in block 57; that the plaintiff refused to pay such tax, and the same was returned delinquent; that the defendant William J. Hay, county treasurer, had advertised the same for sale for the payment of such tax, and was threatening to sell the same at the time of the commencement of this action.

And as conclusions of law the court found, in effect, that the plaintiff is entitled to the relief demanded in the complaint; that the proceedings taken by the common council to vacate a portion of Dodge street were null and void; that all that portion of Dodge street east of North Michigan street not condemned for the harbor improvement was still a public highway of the city; that all of the proceedings taken by the common council and the board of public works to require the plaintiff to build and pay for the dock in question, east of North Michigan street, and the special assessment certificate issued by the board of public works to the defendant Jones for building said dock, were and are null and void; that the plaintiff is entitled to recover his costs in this action—and ordered judgment to be entered accordingly. From the judgment so entered the city appeals.

For the appellant there was a brief by *M. E. Walker,* city attorney, and *W. H. Timlin,* of counsel, and oral argument by *Mr. Timlin.*

For the respondent there was a brief by *Palmer & Gittings,* attorneys, and *Thos. M. Kearney,* of counsel, and oral argument by *Mr. C. C. Gittings* and *Mr. Kearney.*

CASSODAY, C. J.   It appears that North Michigan street runs north from Root river to Hamilton street, and that Dodge street formerly ran directly east from near the south end of North Michigan street. The plaintiff's lands are located in block 57, immediately east of North Michigan street, and immediately north of what was formerly Dodge street. Block 66, mentioned, is north of Root river, and immediately west of North Michigan street; and block 67, mentioned, is immediately south of what was formerly Dodge street, and east of North Michigan street. It appears that formerly Root river ran from a point a little more than a block west of the south end of North Michigan street, in a southeasterly direction, to the lake; that several years ago it

was straightened by cutting a channel through what was then block 67, so as to run from the point mentioned almost directly east to the lake. That channel, in its narrowest place, before the change in question, was about 150 feet wide. Between the north dock line of that channel, as it then existed, and Dodge street, was a strip of land belonging to one F. M. Knapp—being a part of block 67—and running from the south end of North Michigan street east for a distance of about 600 feet. The new dock line upon the channel or harbor being so widened is located about seventy feet north of the old dock line, and extends from a point about three .feet north of the middle of what was then Dodge street, at the east line of North Michigan street, easterly in a straight line for a distance of 814 feet to a point where it intersects the north line of Dodge street, and then continues a little over fifty feet further east. The deed given by the plaintiff to the United States, and mentioned in the eleventh finding of fact, only covered a very small piece of land east of such intersection of such new dock line and the north line of Dodge street, and was only appraised at $1. The deed directed to be given by the mayor and city clerk to the United States, and mentioned in the tenth finding of fact, included the portion of what was then Dodge street south of the new dock line so established. Thus it appears that the land included in the harbor so widened includes all south of the center of what was then Dodge street, and about one half of the north half of what was then that street. The part so included in the north half of Dodge street was in the form of a quadrangle, with the west end only three feet wide.

The new channel, cut several years ago, through block 67— straightening Root river—although an artificial channel, yet was navigable and must be regarded, for the purposes of this case, as giving to the abutting owners and the public the same rights and remedies that they would have had in case such channel had been a natural watercourse. *Lawson v. Mowry,*

52 Wis. 219, 9 N. W. 280; *Weatherby v. Meiklejohn,* 56 Wis. 73, 13 N. W. 697; *Mendota Club v. Anderson,* 101 Wis. 493, 78 N. W. 185; *Pewaukee v. Savoy,* 103 Wis. 277, 79 N. W. 436. It follows that prior to the proceedings in question the owner of the strip of land between such channel and Dodge street was a riparian owner on the channel, and an abutting owner on the street, whereas the plaintiff was simply an abutting owner on the street, except as to the small piece north of Dodge street at the extreme east, mentioned, which extended to the harbor. As such abutting owners, each owned the fee to the center of the street, subject, of course, to the public easement. No one will claim that the plaintiff could have been compelled to build, or pay for the building of, a dock along on the north side of what was then Dodge street, so long as the dock and shore line of the harbor remained seventy feet south of Dodge street. The claim that the plaintiff can be compelled to build, or pay for the building of, the dock in question, therefore, presupposes the rightful destruction of Dodge street, and the rightful extension of the harbor to the new dock line thus established. It is claimed on the part of the plaintiff, and the trial court held, that the proceedings to vacate the portion of Dodge street mentioned were null and void for want of jurisdiction of the subject-matter, by reason of the failure to give the requisite notice or procure the requisite determination, as required by the charter. Assuming, for the purpose of this appeal, that the proceedings to vacate the portion of the street mentioned were in accordance with the requirements of the city charter, still the question presented is whether the plaintiff could be compelled to build, or pay for the building of, a dock in accordance with the plans and specifications then on file, on the new dock line thus established, for a distance of 871 feet, at a cost of $12,614.98, as mentioned in the findings.

The proceedings for widening and deepening the harbor were at first commenced in November, 1897, under the gen-

eral statutes.  For that purpose, surveys, plats, and descrip-
tions of the lands to be taken therefor were made and re-
ported to the common council and filed with the city clerk,
and adopted as prescribed in sec. 895, Stats. 1898, as late as
March 7, 1898; and the city clerk was thereupon directed to
give notice of an application to be made for the selection and
appointment of a jury to condemn and appraise the prop-
erty to be so taken, as prescribed in sec. 896.  An attempt.
was made to vacate a portion of the street mentioned, with-
out notice to the parties interested, November 14, 1898, but
the same was reconsidered December 5, 1898; and thereupon
notice was given by publication for the vacation of the por-
tion of the street mentioned, and the city claims that it was
duly vacated January 3, 1899.  The dock line was not estab-
lished until March 20, 1899, and then plans, specifications,
and estimates were directed to be made, and the same were
made, reported, and adopted, in June, 1899.  Thereupon,
and in August, 1899, the board of public works were directed
to build the dock as directed in the ordinance therefor,
adopted July 19, 1899, and to take charge of the same as pre-
scribed in the city charter.  The general statutes under
which the proceedings were at first instituted are secs. 895–
904, Stats. 1898, inclusive.  These sections are all contained
in the chapter on "Villages," but another section of the stat-
utes contained in the chapter entitled "General Provisions
Relating to Municipalities Including Cities of Both Classes,"
provides:

.  "The board of trustees of every such village and the com-
mon council of every city may exercise all the powers con-
ferred on village boards by secs. 895 to 904, inclusive, and
proceed in the manner therein prescribed to  .  .  .  alter,.
widen or straighten any watercourse, or take ground  .  .  .
for the use or improvement of a harbor, as well as by the pro-
visions of their respective charters; and the provisions of the
sections aforesaid shall be taken as applicable to such villages
and cities."  Sec. 927, Stats. 1898.

Under these sections, it is provided that whenever the common council of any city "shall intend to . . . alter, widen or straighten watercourses therein, or take grounds for the use or improvement of a harbor, and it shall be necessary to take private property therefor, they shall cause an accurate survey and plat thereof to be made and filed with the clerk," and they may purchase or take by donation or condemnation, in the manner prescribed, such grounds as may be needed therefor. Sec. 895. In such condemnation proceedings, the jury must first find the necessity for the taking, and then the common council may enact an ordinance for "altering, widening or straightening any such watercourse, or for the use or improvement of a harbor, but shall not enter upon any such land therefor until the owner be paid in full the damages awarded him." Sec. 902. The statute then provides that:

"For the purpose of payment of the expenses, including all damages and costs incurred for the taking of private property and of making any improvement mentioned in the last preceding section, the village board [the common council of a city] may, by resolution, levy and assess the whole or any part, not less than half, of such expenses, as a tax upon such property as they shall determine is *specially benefited thereby,* making therein a list thereof in which shall be described every lot or parcel of land so assessed with the name of the owner thereof, if known, and the amount levied thereon set opposite." Sec. 903.

No levy or any tax or assessment of the whole or any part of the expenses of building such dock was ever made upon such property as the common council determined or might have determined to be "specially benefited thereby," as prescribed in that section. It is unnecessary to inquire whether the plaintiff might have been compelled to pay one half or any part of the expense of building such dock, under such general statutes, since there was no attempt to compel him to make such payment under those statutes. On the contrary, plans, specifications, and estimates of the cost of building

such dock 871 feet long were made and adopted by the common council in the summer of 1899; and on August 7, 1899, the board of public works were directed to take charge of the work and to cause the dock to be built according to such plans, specifications, and estimates "as provided by the city charter," if the plaintiff should fail to begin the building of the dock within thirty days after notice therefor. Notice was thereupon given to the plaintiff to build such dock, which he declined to do; and the board of public works thereupon proceeded to cause the dock to be built, as mentioned in the statement of facts. The precise question presented is whether, by virtue of the provisions of the city charter, the plaintiff can be compelled to pay $12,614.98, the amount of the expense of building such dock.

The provisions of the city charter relied upon are contained in secs. 65, 66, 67, 76, 77, ch. 40, Laws of 1891, and are as follows:

"Sec. 65. The common council may by ordinance or resolution order . . . the building and repair of lake shore protection, . . . the improvement and dredging of the harbor, the building, and repair of docks along Root river, and the filling of the lots adjoining such docks, the abatement of nuisances upon private property. . . . The common council ordering such work shall require the making of such improvements or doing such work in accordance with such plans, profiles, and specifications filed with the city clerk . . . and shall direct the board of public works to take charge thereof.

"Sec. 66. Every ordinance or resolution requiring the building or repair of docks, the dredging of the harbor or river and filling of lots, or the abatement of nuisances on private premises shall require the respective owners of the real estate in front of or upon which such work is to be done, to build, rebuild, or repair such docks, to dredge the harbor to a distance of fifty feet from their dock lines, or to fill such lots, or to abate such nuisances, within a reasonable time therein to be specified, but not to be less than ten days from the publication of such ordinance or resolution. The publi-

cation of such ordinance or .resolution in the official paper of the city shall be a sufficient request upon such owners to. perform such work or to make such improvements.

"Sec. 67. If, after the expiration of the time limited for the building or repairing of docks, filling of lots, dredging of Root river or abating any nuisance by the owners of property such work or improvement shall remain undone, the board of public works may advertise for bids and award the contract for such work, and the cost of such work done upon or in front of such real estate shall be charged and levied as a special assessment upon the several parcels of land in front of or upon which said work shall have been done, and such assessment shall be made by the board of public works and be filed with the city clerk."

"Sec. 76. All contracts for the performance of work for which special assessments are authorized, shall contain a provision that the contractor shall receive in payment the certificates of special assessments upon the particular lots or parcels of land liable to be assessed therefor," etc.

Sec. 77 provides for the issue of certificates of special assessments by the board of public works, and the mode of collecting the same, and that sales of delinquent special assessments and certificates for special assessments shall be liens upon the lots or parcels of land against which the same shall be respectively chargeable.

Counsel for the plaintiff contends that such provisions of the charter do not purport to confer any power or authority upon the common council in respect to the building of docks, nor in respect to the collecting of the cost thereof, under the circumstances of this case; that these sections, when read together, do not refer to any improvement such as is described in this record; and that they merely authorize the common council to adopt and enforce police regulations with reference to the keeping of the premises of owners abutting upon navigable streams in a safe and proper state of repair.

For the purposes of this appeal, we shall assume that the charter provisions mentioned were intended to apply, and do in terms apply, to the construction of a dock like the one in

question. We shall, moreover, assume, as counsel for the city contend, that the plaintiff is a riparian proprietor abutting on the harbor as now constructed—unincumbered by the public easement of any street. Upon such assumptions, the important question presented is whether such provisions are valid and enforceable against the plaintiff in the case at bar. The charter nowhere provides for any assessment upon such property as may be specially benefited. As we understand, counsel for the city seek to maintain the assessment against the plaintiff upon the broad ground that the city placed a valuable improvement upon the plaintiff's land; that the plaintiff knew the work was in progress, and encouraged the same by conveying to the United States the small piece of land at the extreme east end of the dock line December 22, 1898, as mentioned; and hence that the plaintiff is estopped from questioning the validity of such assessment in a court of equity. It is conceded that the plaintiff refused to build the dock, and there is no pretense that he ever promised or consented to pay the expense thereof. It is not the case of mere irregularities and failures to comply with minor statutory requirements, as in some of the cases cited by counsel, and many others which might be cited. There is a broad distinction between such irregularities and failures while proceeding under authority of law, and proceedings contrary to law or without law. *Drummond v. Eau Claire,* 85 Wis. 556, 560–564, 55 N. W. 1028, and cases there cited; *Jorgenson v. Superior,* 111 Wis. 561, 567, 568, 87 N. W. 565. The proposition urged by counsel for the city involves the surrender by the plaintiff of a strip of land along the shore of the harbor for a distance of 871 feet for a public dock, and then the right to compel him to construct thereon, or to pay the expense of such construction of, a public dock, according to the plans and specifications so prescribed by the city. Such dock is not only for the benefit of the citizens of Racine and Wis-

·consin, but for the convenience of domestic and interstate and foreign commerce. If, by the charter provisions in question, the plaintiff can, regardless· of special benefits, be compelled to construct such dock on his own land and at his own expense, or to pay for the expense of such construction, then ·constitutions are of little value. The constitution of this ·state declares that "the property of no person shall be taken for public use without just compensation therefor." Sec. 13, ·art. I. So the constitution of the United States expressly ·prohibits the state from depriving any person of his property without due process of law. Sec. 1, art. XIV, Amendm. It was held many years ago by the supreme court of the United ¡States that:

"The owner of land bounded by a navigable river has cer·tain riparian rights, whether his title extends to the middle ·of the stream or not. Among these are free access to the .navigable part of the stream, and the right to make a landing, wharf, or pier *for his own use, or for the· use of the public*. 'These rights are valuable and are property, and can be taken for the public good only when due compensation is made. They are to be enjoyed subject to such general rules and laws as the legislature may prescribe for the protection of the public right in the river as a navigable stream." *Yates v. Mil·waukee,* 10 Wall. 497.

See, also, *Pumpelly v. Green. Bay Co.* 13 Wall. 166; *Pear·sall v. Eaton Co.* 74 Mich. 558, 42 N. W. 77; *Willamette Ironworks v. Oregon R. & N. Co.* 26 Oreg. 224, 37 Pac. 1016, 29 L. R. A. 88. In this last case it was held that:

"Any structure on a street which is subversive of and repugnant to its use and efficiency as a public thoroughfare is not a legitimate street use and imposes a new servitude on the rights of abutting owners for which compensation must be made. The use of a street for other than legitimate ·street purposes, which constitutes any impairment of or in·terference with the easements of an abutting owner, is a tak·ing of his property, within the meaning of the constitution."

In the Michigan case cited, proceedings were instituted to discontinue a portion of a state road, and it was held that:

"The *benefits* to be received by a person whose land is taken by the public for a road are a part of the consideration for the release of the land, or its condemnation for that purpose, and when once vested in him, or he becomes entitled thereto, are as much his property as the land itself; and neither the state, nor any of its subordinate agencies, can deprive him of them without notice, a finding of public necessity, and compensation ascertained by a constitutional jury."

This court has held that:

"The legislature of this state may authorize municipal corporations to levy special assessments upon the adjoining lots for the improvement of highways by land or water within the municipality. Under the charter, . . . abutting property could be assessed for highway improvements *only* to the extent to which it was actually benefited;" otherwise "the assessment is invalid. Where such an assessment is invalid, equity will restrain the issue of the certificate to the contractor." *Johnson v. Milwaukee,* 40 Wis. 315, 324.

In that case, RYAN, C. J., aptly said:

"We rest our decision, not upon the rule of assessment, but upon the necessity of assessment, fairly and actually made, upon actual view of the premises to be assessed, of the benefits actually accruing to the premises by the improvement."

In a later case it was held that, where the assessment in such a case is void, the lot owner "may proceed in equity to set aside a tax sale and certificate based thereon." *Liebermann v. Milwaukee,* 89 Wis. 336, 346, 61 N. W. 1112. Mr. Justice PINNEY, speaking for the court, there said:

"We are impressed with the necessity that a strict compliance with the law on all points affecting the substantial justice of the assessment is an essential condition to a valid assessment, and that the assessment *must show upon its face* that the board has considered and passed upon all questions

made material by the statute, and the results at which they have arrived."

To the same effect, *Hayes v. Douglas Co.* 92 Wis. 429, 441, 65 N. W. 482; *Kersten v. Milwaukee,* 106 Wis. 200, 204, 81 N. W. 948, 1103.

The supreme court of the United States has recently declared the true rule applicable in a case like this as follows:

"The principle underlying special assessments upon private property to meet the cost of public improvements is that the property upon which they are imposed is peculiarly benefited, and therefore that the owners do not.in fact pay anything in excess of what they receive by reason of such improvement. The exaction from the owner of private property of the cost of a public improvement in substantial excess of the special benefits accruing to him is, to the extent of such excess, a taking, under the guise of taxation, of private property for public use without compensation." *Norwood v. Baker,* 172 U. S. 269, 19 Sup. Ct. 187.

That was a case in equity, the same as this. Id., 172 U. S. 290, 19 Sup. Ct. 187. The case was considered in the later case of *French v. Barber A. P. Co.* 181 U. S. 324, 21 Sup. Ct. 625, in which the court divided, but the majority of the court, as well as the minority, reaffirm the decision in *Norwood v. Baker, supra. French v. Barber A. P. Co.* 181 U. S. 325, 344, 349, 359, 368, 369, 21 Sup. Ct. 625. The principles therein declared certainly apply to the case at bar, for here the question of special benefits was not provided for in the charter—much less, considered by the city authorities.

The suggestion that the provisions of the charter to compel riparian proprietors to construct such docks at their own expense on their own land are justified as an exercise of the police power of the state is without foundation. Certainly the dock was not essential to promote the health, peace, morals, education, or the good order of the people; nor do we

think such enforced contribution is a legitimate exercise of any of the police powers of the state.

We find no error in the record.

*By the Court.*—The judgment of the circuit court is affirmed.

WINSLOW and DODGE, JJ., took no part.